1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

8
9
10

| | |
|---|---|
| **DAN CAMERON G.,**[1] | ) NO. EDCV 19-1502-KS |
| **Plaintiff,** | ) |
| **v.** | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| **ANDREW SAUL, Commissioner** | ) |
| **of Social Security,** | ) |
| **Defendant.** | ) |
| _____ | ) |

17
18

## INTRODUCTION

19

Dan Cameron G. ("Plaintiff") filed a Complaint on August 13, 2019, seeking review of the denial of his application for a period of disability and disability insurance benefits ("DIB"). On September 17, 2019, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 9, 10, 11.) On July 10, 2020, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 21.) Plaintiff seeks an order remanding for the immediate award of benefits or, in the alternative, for further proceedings. (Joint Stip. at 25.) The Commissioner requests that the ALJ's decision be

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1  affirmed or, in the alternative, remanded for further proceedings.  (*See id*. at 26.)  The Court

2  has taken the matter under submission without oral argument.

3

4  **SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

5

6  In August 2015, Plaintiff, who was born on October 21, 1955, filed an application for a

7  period of disability and DIB.[2]  (*See* Administrative Record ("AR") 15, 185; Joint Stip. at 2.)

8  Plaintiff alleged disability commencing March 5, 2014 due to:  left elbow injury (lateral

9  epicondylar debridement); arthritis; carpal tunnel on both wrists; "knee problems on both and

10  right ankle"; "rotor cups on both shoulders"; hernia in stomach; depression; anxiety; "back";

11  incontinence due to prostate surgery; and prostate cancer.  (AR 322 (errors in original).)

12  Plaintiff previously worked as an automobile mechanic (DOT 620.261-010). (AR 22, 63, 323.)

13  After the Commissioner denied Plaintiff's applications initially (AR 83) and on

14  reconsideration (AR 96), Plaintiff requested a hearing (AR 113).  Administrative Law Judge

15  Lyn Farmer ("ALJ") held a hearing on August 22, 2018.  (AR 30.)  Plaintiff, who was

16  represented by counsel, testified before the ALJ as did vocational expert ("VE") Marcos

17  Molinar.  (AR 30-72.)  On October 25, 2018, the ALJ issued an unfavorable decision, denying

18  Plaintiff's application.  (AR 15-24.)  On July 22, 2019, the Appeals Council denied Plaintiff's

19  request for review.  (AR 1-3.)

20  \\

21  \\

22  \\

23  \\

24

25  [2]      Plaintiff was 58 years old on the alleged onset date and thus met the agency's definition of a person of advanced age.  *See* 20 C.F.R. § 404.1563(e).  Advanced age significantly affects a person's ability to adjust to other work.  *Id.* (citing

26  20 C.F.R. § 404.1568(d)(4)).  Plaintiff subsequently changed age categories to an individual closely approaching retirement age, and the Commissioner has special rules for persons closely approaching retirement age (age 60 or older).  *Id.*

27  Specifically, "[i]f you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light

28  work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry."  20 C.F.R. § 404.1568.

1

2

## SUMMARY OF ADMINISTRATIVE DECISION

3

4      The ALJ found that Plaintiff met the insured status requirements of the Social Security

5   Act through September 30, 2021.  (AR 17.)  The ALJ further found that Plaintiff had not

6   engaged in substantial gainful activity since his alleged onset date of March 5, 2014.  (AR 17.)

7   The ALJ determined that Plaintiff had the severe impairments of degenerative disc disease and

8   status post lateral epicondylectomy of the left elbow.  (AR 17.)  In reaching this conclusion,

9   the ALJ found that the following other alleged impairments were not "severe" for the purposes

10  of step two of the analysis:  Plaintiff's history of ventral and umbilical hernia requiring surgical

11  repair was not a severe impairment; carpal tunnel; right rotator cuff tear; and prostate cancer.

12  (AR 18.)  The ALJ further concluded that Plaintiff did not have an impairment or combination

13  of impairments that met or medically equaled the severity of any impairments listed in 20

14  C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526),

15  including Listing 1.02 (concerning major dysfunction of a joint) and Listing 1.04 (concerning

16  degenerative disc disease).  (AR 18.)  The ALJ determined that Plaintiff had the residual

17  functional capacity ("RFC") to perform medium work,[3] which "involves lifting no more than

18  50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds,"

19  with the following exceptions:

20          He is limited to frequent climbing of ramps and stairs, balancing, stooping,

21          kneeling, crouching, and crawling; he can occasionally climb ladders, ropes,

22          and scaffolds; he is limited to frequent handling with the left upper extremity;

23          and he must avoid concentrated exposure to extreme cold, heat, vibration,

24          unprotected heights, moving mechanical parts, not including automobiles.

25

26  (AR 18.)

27

28  [3]     The Commissioner's definition of medium work is contained in 20 C.F.R. § 404.1567(c).

1
2
3
4
5
6
7
8
9
10

The ALJ found that Plaintiff was able to perform his past relevant work as an automobile mechanic (DOT 620.261-010).  (AR 22.)  Additionally, the ALJ also determined that Plaintiff, considering his age, education, work experience, and residual functional capacity, had work skills from past relevant work that are transferable to other occupations that are classified as "light work"[4] and exist in significant numbers in the national economy, including the representative occupations of wire harness assembler (DOT 728.684-010),[5] gas meter mechanic II (DOT 710.684-026), electronics assembler (DOT 726.684-018), and semi-conductor assembler (DOT 726.684-034).  (AR 22-23.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the ALJ's decision.  (AR 23.)

11
12
13

## STANDARD OF REVIEW

14
15
16
17
18
19
20
21
22

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted).  "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

23
24
25
26

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and

27
28

---

[4]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).

[5]    The ALJ misidentified the Dictionary of Occupational Titles listing as DOT 724.687-010, but the VE testified that the DOT number for the occupation of wire harness assembler is 724.684-010.  (*Compare* AR 23 *with id.* 65.)

4

the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in her decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

Plaintiff presents the Court with three issues for consideration: (1) whether the ALJ properly considered the medical evidence and medical opinions in formulating his assessment of Plaintiff's residual functional capacity (Joint Stip. at 3); (2) whether the ALJ properly considered Plaintiff's statements about his symptoms and limitations (*id.* at 4); and (3) whether the ALJ's conclusions at step four of the sequential analysis are supported by substantial evidence in the record (*id.*).

\\
\\
\\
\\

## I.      The ALJ's Consideration of the Medical Evidence and Opinions

With regards to the first issue in dispute, Plaintiff argues that the ALJ "disregarded all of the treating medical evidence and instead opt[ed] to give significant weight to the opinions of the Defendant's consultative orthopedic examiner, Dr. Bernabe." (Joint Stip. at 5.)  Plaintiff suggests that, as a result, the ALJ's conclusion that Plaintiff can perform medium work, *i.e.*, that Plaintiff can lift up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, is not supported by substantial evidence in the record.  (*See id.*) The Court agrees.

### A. Medical Evidence

The medical record shows that Plaintiff suffered a series of injuries and surgeries beginning with his prostate cancer diagnosis and March 6, 2014 prostatectomy.  (AR 656.) Six days after his surgery, on March 12, 2014, Plaintiff was discharged from the hospital with a night bag and leg bag.  (AR 411, 459.)  On April 30, 2014, he returned for a follow up appointment and reported mild discomfort with physical activity.  (AR 422.)  His doctor extended his return to work date to May 10, 2014.  (AR 422.)  Plaintiff returned to work in May 2014, but, on May 14, 2014, he injured his left elbow at work while removing a radiator from a truck.  (AR 538.)  Plaintiff was initially treated with physical therapy and a forearm strap, and he experienced gradual improvement.  (AR 538.)  However, he continued to experience moderate pain that became worse with lifting or twisting activities.  (AR 538.)  He was placed on modified work duty with no lifting or carrying greater than 10 lbs.  (AR 538.) Because his employer was unable to accommodate this modification, Plaintiff was off work. (AR 538.)  On August 7, 2014, Andrew S. Wong, M.D., an orthopedic surgeon who is board certified in surgery of the hand and a Fellow of the American Academy of Orthopedic Surgeons, examined Plaintiff and determined that Plaintiff's symptoms were consistent with

lateral epicondylitis.  (AR 540.)  Plaintiff demonstrated a "good" range of motion at the time of the diagnosis.  (AR 540.)

At a follow up visit on September 4, 2014, Dr. Wong observed tenderness to palpation over Plaintiff's medial epicondyle and increased pain with resisted wrist extension.  (AR 544.) Dr. Wong administered an injection and recommended an MRI.  (AR 544.)  Plaintiff received an MRI later that month.  (AR 547.)  Dr. Wong reviewed the MRI with Plaintiff on October 16, 2014 and found that it revealed "severe tendinosis and high-grade partial tearing of the origin of the common extensor tendon."  (AR 550.)  Dr. Wong opined that this was "an acute injury" that would require surgery.  (AR 550-51.)  Dr. Wong kept Plaintiff on modified duty with no lifting, pushing, or pulling greater than 10 lbs with his left upper extremity.  (AR 551.)

On November 14, 2014, while awaiting authorization for his left elbow surgery, Plaintiff underwent a surgical "mesh repair" of ventral and umbilical hernias with surgeon Jason T. Wong, M.D., FRCSC.  (AR 849, 854.)  Plaintiff's post-care instructions included no running, jumping, or lifting objects heavier than 20 lbs for six weeks.  (AR 854.)

It took several months for Plaintiff to receive authorization for the elbow surgery requested by Dr. Andrew Wong.  (*See* AR 553-565.)  During that time, Dr. Wong kept Plaintiff on modified duty with no lifting, pushing, or pulling greater than 10 lbs with his left upper extremity.  (AR 555-62.)  On March 11, 2015, more than a year after Plaintiff's prostatectomy in March 2014, Plaintiff presented for a preoperative appointment for a left elbow lateral epicondylar debridement and repair.  (AR 565.)  At that point, Plaintiff had spent virtually the entirety of the preceding 12 months unable to perform his work as a mechanic, as he performed it, due to the recovery period following his prostatectomy and the May 14, 2014 injury to his left elbow.

1
2
3
4

5

6
7
8
9
10
11
12
13
14

15

16
17
18
19
20
21
22
23
24
25
26
27

28

On April 3, 2015, Plaintiff underwent surgery on his left elbow.  (AR 569.)  On April 17, 2015, Dr. Wong stated that Plaintiff should work on range of motion at home but should not perform any heavy grasping or lifting.  (AR 571.)  He stated that Plaintiff was temporarily totally disabled and would be referred for physical therapy in four weeks.  (AR 571.)

On April 29, 2015, Plaintiff received an initial occupational therapy evaluation.  (AR 578.)  Plaintiff reported having severe difficulty opening a tight jar, pushing open a heavy door, and placing an object on the shelf above his head.  (AR 578.)  The occupational therapist, Harold Neuendorff OTR/L, CHT, observed that Plaintiff had mild swelling, decreased elbow flexion, proximal forearm impaired function, and difficulty performing tasks requiring rotational pull and sustained grasp.  (AR 580.)  Neuendorff set a goal for Plaintiff to be functionally capable for returning to work in eight weeks (*i.e.*, June 24, 2015).  (AR 580.)  A month later, on May 29, 2015, Plaintiff followed up with Dr. Andrew Wong who requested authorization for an additional 12 occupational therapy visits.  (AR 601-02.)

On June 1, 2015, a few days after his follow up with Dr. Wong, Plaintiff completed a second questionnaire concerning his ability to perform certain activities.  (AR 610.)  Plaintiff no longer indicated "severe difficulty" in any areas but indicated "moderate difficulty" with opening a tight jar, turning a key, preparing a meal, placing an object on the shelf above his head, doing heavy household chores, doing yard work, making a bed, carrying shopping bags or briefcases, changing a light bulb overhead, washing/drying his hair, washing his back, putting on a pullover sweater and, *inter alia*, recreational activities in which he moved his arm freely or took some force or impact through his arm/shoulder/hand.  (AR 610.)  At his occupational therapy appointment that same day, Neuendorff observed continued swelling in Plaintiff's left elbow and deficits in Plaintiff's ability to lift, carry, twist, and apply an "aggressive" tight grasp.  (AR 610.)  Like Dr. Andrew Wong, Neuendorff also reported that Plaintiff would benefit from continued treatment for his left elbow.  (AR 610.)

On July 10, 2015, Plaintiff had another follow up with Dr. Wong who observed a good range of motion and some improvement in Plaintiff's left elbow pain but concluded that Plaintiff should not engage in lifting, pushing, or pulling of any object greater than 10 lbs and should not perform "repetitive activity."  (AR 1307.)  Three days later, Neuendorff observed "palpable swelling" in Plaintiff's left elbow and "focal tenderness with forearm extension." (AR 1309.)  On July 14, 2015, Neuendorff opined that Plaintiff's function would be impaired in performing "aggressive resisted tasks" or "heavy lifting."  (AR 1312.)

On August 20, 2015, Plaintiff saw Dr. Wong again, who stated that Plaintiff had not responded completely to the surgery, had developed significant olecranon swelling, and had developed a separate area of firm swelling over the proximal ulna.  (AR 1314.)  Dr. Wong requested authorization for an MRI to determine the cause of the swelling over the proximal ulna.  (AR 1314.)  Dr. Wong continued to restrict Plaintiff from any lifting, pushing, or pulling of objects greater than 10 lbs as well as from "repetitive activity."  (AR 1314.)

On October 6, 2015, Plaintiff completed an Adult Function Report in connection with his application for benefits.  Plaintiff reported that his left elbow injury prevented him from lifting, pulling, or shoving more than 10 lbs and he also suffered from incontinence due to his prostatectomy.  (AR 332.)  He stated that, during an average day, he showers, dresses and feeds himself, watches TV, reads, and walks around the backyard.  (AR 333.)  He stated that his sleep is interrupted by the pain in his elbow and shoulder.  (AR 333.)  When asked if he prepares meals or food, he wrote "does not apply."[6]  (AR 334.)  When asked if he performs household chores, Plaintiff wrote that he can dust and do small loads (less than 10 lbs) of laundry.  (AR 334.)  He stated that he cannot do the things he used to enjoy, including hiking, working on cars, and doing home repairs.  (AR 336.)  Shortly after completing this Adult

---

[6] Plaintiff's live-in girlfriend, Rosi DiPonio, reported in a Third Party Adult Function Report prepared on April 17, 2016 that Plaintiff does not cook anymore and she prepares food for him.  (AR 352.)  She stated that once or twice a week Plaintiff prepares sandwiches or frozen meals, but she usually leaves food for him to warm up.  (AR 353.)

9

Function Report, on October 21, 2015, Plaintiff turned 60 years old, rendering him a person closely approaching retirement age for the purposes of the Commissioner's grids and regulations.

On January 29, 2016, Plaintiff underwent a consultative orthopedic evaluation with Dr. Vicente Bernabe, D.O., a board-certified Diplomate with the American Board of Orthopaedic Surgery.  (AR 495-504.)  Dr. Bernabe indicated that he did not have any of Plaintiff's (extensive) prior medical records to review.  (AR 495.)  He observed that Plaintiff had a normal range of motion in his shoulders, no atrophy or spasm, no swelling, tenderness, or atrophy in his arms, and a normal range of motion without tenderness in his elbows.  (AR 498.)  He stated that Plaintiff's strength was within normal limits in all extremities, radiographs of Plaintiff's left elbow were normal and unremarkable, and Plaintiff would be able to lift and carry 50 lbs occasionally and 25 lbs frequently as well as stand, sit, and walk for six hours in an eight-hour workday.  (AR 500.)

On February 10, 2016, state agency physician R. Weeks, an Ear Nose and Throat specialist (*see* AR 83 (identifying medical specialty code as "08")), reviewed Plaintiff's medical records and reached the same conclusion as Dr. Bernabe:  Plaintiff would be able to lift and carry 50 lbs occasionally and 25 lbs frequently as well as stand, sit, and walk for six hours in an eight-hour workday.  (AR 1243.)

On February 15, 2016, approximately two weeks after Dr. Bernabe's examination, Ralph Steiger, M.D., orthopedic surgeon, examined Plaintiff and, like Dr. Wong, observed an unexplained firm lump over Plaintiff's left proximal ulna.  (AR 1243.)  Dr. Steiger diagnosed Plaintiff with medial and lateral epicondylitis left elbow, cubital tunnel syndrome left elbow, status post lateral epicondylar release left elbow.  (AR 1243.)  Dr. Steiger opined that Plaintiff could return to modified work with one restriction:  <u>no</u> use of his left upper extremity.  (AR 1243.)

On April 17, 2016, Plaintiff completed a second Adult Function Report, which largely reiterated his earlier statements, including that he is unable to lift, pull, or shove more than 10lbs. (AR 371.) He stated that when he shops, his girlfriend comes with him because he cannot lift anything more than a few pounds. (AR 374.)

On May 6, 2016, state agency physician F. Kalmar, a physical medicine specialist (*see* AR 96 (identifying medical specialty code as "34")), reviewed Plaintiff's medical records and reached the same conclusion as Drs. Bernabe and Weeks: Plaintiff would be able to lift and carry 50 lbs occasionally and 25 lbs frequently as well as stand, sit, and walk for six hours in an eight-hour workday. (AR 91.) Dr. Kalmar also opined that Plaintiff would be limited in his ability to perform handling and gross manipulation with his left hand. (AR 92.)

In late June 2016, Plaintiff began receiving treatment for his left elbow with Asgahar Husain, MD, orthopedic surgeon and clinical assistant professor in orthopedics at the USC Keck School of Medicine. (AR 1317.) After examining Plaintiff and reviewing his diagnostic studies, Dr. Husain stated that his diagnostic impression was "left elbow painful posterolateral synovial impingement," a partial distal biceps tear left elbow, persistent lateral epicondyle symptoms post epicondyle debridement repair, and painful radial nerve compression of the left elbow. (AR 1320.) A July 29, 2016 MRI showed fullness of soft tissue in Plaintiff's left elbow region suggestive of localized subcutaneous edema and several arthritic changes, some of which could be suggestive of mild subacute lateral epicondylitis. (AR 1322-23.)

On September 30, 2016, Plaintiff was again diagnosed with central and umbilical hernias and recommended for a second robotic mesh repair surgery with Dr. Jason Wong. (AR 1246.) Plaintiff received hernia surgery on November 14, 2016. (AR 1247-48.)

On December 15, 2016, Dr. Husain confirmed that Plaintiff had a 50% tear of the left distal biceps and recommended a rehabilitation program. (AR 1337-38.) On March 7, 2017,

Dr. Husain reported that he had been unable to get authorization for physical therapy but would try again. (AR 1346.)

In September 2017, less than a year after his November 14, 2016 hernia surgery, Plaintiff injured his *right* shoulder while doing yardwork. (AR 1092.) The initial diagnosis was "RC insufficiency with possible RC tear," and Plaintiff started physical therapy. (AR 1097.) On October 18, 2017, an MRI confirmed a full thickness tear with retraction involving a large portion of the supraspinatus tendon, a small articular sided partial thickness tear of infraspinatus tendon, a significant background of tendinopathy, and moderate joint effusion with synovial hypertrophy. (AR 1265.) Plaintiff was recommended for surgery and, in December 2017, he was fitted for a shoulder immobilizer (AR 1274) and underwent right shoulder arthroscopy, rotator cuff repair of the supraspinatus tendon, arthroscopic biceps tenodesis, subacromial decompression, distal clavical resection, and extensive intra-articular debridement. (AR 1290.) On December 29, 2017, 10 days after the surgery, Plaintiff was wearing, and told to continue wearing, a sling. (AR 1292.) Plaintiff continued to see Dr. Husain in connection with his left elbow condition following his right shoulder surgery. (*See, e.g.,* AR 1350.)

On August 20, 2018, Raymond K. Zarins, M.D., an orthopedic surgeon and Qualified Medical Examiner, performed an orthopedic re-evaluation of Plaintiff in connection with Plaintiff's worker's compensation claim concerning his left elbow. (AR 1353.) Dr. Zarins diagnosed Plaintiff with the following: a sprain/strain of the left elbow; status postoperative left elbow surgery; thinning of distal biceps tendon adjacent to moderate irregular spurring of radial tuberosity compatible with chronic-appearing partial tearing of distal biceps tendon; moderate extensor and flexor tendinosis; left cubital tunnel syndrome; and residual lateral epicondylitis left elbow. (AR 1259.) Dr. Zarins stated that Plaintiff "cannot return to his usual unrestricted work and . . . should avoid repeated forceful grasping on the left as well as very

1  heavy pushing and pulling activity greater than 30 pounds with the left upper extremity at or
2  about chest height."  (AR 1361.)

3

4      **B.  Applicable Law**

5

6      "The ALJ is responsible for translating and incorporating clinical findings into a
7  succinct RFC."  *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).  In
8  doing so, the ALJ must articulate a "substantive basis" for rejecting a medical opinion or
9  crediting one medical opinion over another.  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir.
10  2014); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("an ALJ cannot in
11  its decision totally ignore a treating doctor and his or her notes, without even mentioning
12  them"); *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) ("Even if a treating physician's
13  opinion is contradicted, the ALJ may not simply disregard it.").

14

15      Generally, the opinion of a treating source is entitled to greater weight than the opinion
16  of doctors who do not treat the claimant because treating sources are "most able to provide a
17  detailed, longitudinal picture" of a claimant's medical impairments and bring a perspective to
18  the medical evidence that cannot be obtained from objective medical findings alone.  *See*
19  *Garrison*, 759 F.3d at 1012; *see* 20 C.F.R. § 404.1527(c)(2) (governing claims filed before
20  March 27, 2017); *but see* 20 C.F.R. § 404.1520c(c) (governing claims filed on or after March
21  27, 2017).[7]  Accordingly, to reject an uncontradicted opinion of a treating or examining
22  physician, the ALJ must provide "clear and convincing reasons that are supported by
23  substantial evidence."  *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v.*
24  *Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014).  Alternatively, "[i]f a treating or examining

25  ─────────────
26      [7]     Because Plaintiff filed his application for benefits before March 27, 2017, it is not subject to the Commissioner's
   revised regulations. The revised regulations provide that ALJs, and other adjudicators for the Commissioner, evaluate
   medical opinions according to specified factors, the most important of which are supportability and consistency, 20 C.F.R.
27  §§ 404.1520c, and states that the Commissioner "will not defer or give any specific evidentiary weight, including controlling
   weight" to any one type of medical opinion and, further, need not specifically address the type of medical relationship that
28  a medical source had with the plaintiff.  20 C.F.R. § 404.1520c.

doctor's opinion *is* contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."[8] *Trevizo*, 871 F.3d at 675 (emphasis added).

In turn, "substantial evidence" means more than a mere scintilla, but less than a preponderance. *Lingenfelter*, 504 F.3d at 1035. In determining whether a particular conclusion is supported by substantial evidence in the record, the Court must consider the entire record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," and "may not affirm simply by isolating a specific quantum of supporting evidence." *Ghanim*, 763 F.3d at 1160 (quoting *Hill*, 698 F.3d at 1159); *Lingenfelter*, 504 F.3d at 1035 (citing *Reddick*, 157 F.3d at 720).

### C. ALJ's Evaluation of the Medical Evidence

The ALJ determined that Plaintiff was able to perform medium work, *i.e.*, lift up to 50 pounds occasionally and frequently lift or carry objects weighing up to 25 pounds, with some restrictions, including, *inter alia*, a limitation to only frequent handling with the left upper extremity. (AR 18.) In reaching this conclusion, the ALJ assigned "significant weight" to the opinion of the consultative examining physician, Dr. Bernabe. The ALJ explained that he credited Dr. Bernabe's January 29, 2016 opinion for two reasons: (1) Dr. Bernabe's specialty was orthopedic surgery; and (2) Dr. Bernabe's assessment of Plaintiff's functioning was consistent with his findings and observations during the examination. (*See* AR 21.) The ALJ

---

[8]       It remains to be seen whether the new regulations will meaningfully change how the Ninth Circuit assesses the adequacy of an ALJ's reasoning and whether the Ninth Circuit will continue to require that an ALJ provide "clear and convincing" or "specific and legitimate reasons" in the analysis of medical opinions, or some variation of those standards. *See Patricia F. v. Saul*, No. C19-5590-MAT, 2020 WL 1812233, at *3 (W.D. Wash. Apr. 9, 2019). Nevertheless, in cases in which the revised regulations are applicable, the Court is mindful that it must defer to the new regulations, even where they conflict with prior judicial precedent, unless the prior judicial construction "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981-82 (2005); *see, e.g., Schisler v. Sullivan*, 3 F.3d 563, 567-68 (2d. Cir. 1993) ("New regulations at variance with prior judicial precedents are upheld unless 'they exceeded the Secretary's authority [or] are arbitrary and capricious.").

also assigned "significant weight" to the opinions of the State agency medical consultants who reviewed Plaintiff's medical records at the initial and reconsideration level: R. Weeks, the Ear Nose and Throat specialist.; and F. Kalmar, the physical medicine specialist.  (AR 21.)

In contrast, the ALJ discounted a portion of the August 2018 opinion of Dr. Zarins, who, like Dr. Bernabe, was an orthopedic surgeon who had the opportunity to examine Plaintiff in person.  Dr. Zarins, who had examined Plaintiff at least once before, opined that Plaintiff should avoid repeated forceful grasping on the left as well as very heavy pushing and pulling of objects greater than 30 pounds.  (AR 20.)  The ALJ declined to credit the second portion of Dr. Zarins' opinion, stating that Plaintiff's "reported activities of daily living shows him functioning at a high level and that he would be capable of lifting and carrying greater weight." (AR 21.)  By way of explanation, the ALJ stated that Plaintiff's activities of daily living include his ability to live alone, swim for exercise, go on trips, and drive long distances on a regular basis.  (AR 21.)

The ALJ assigned "little weight" to the opinion of Ralph Steiger, M.D., one of the numerous orthopedic surgeons who examined Plaintiff in connection with his claim for worker's compensation arising from the injury to his left elbow.  (AR 21.)  The ALJ observed that Dr. Steiger had opined that Plaintiff could only perform modified work that did not require the use of his left upper extremity.  (AR 21.)  The ALJ stated that he discounted Dr. Steiger's opinion for two reasons:  (1) Dr. Steiger's opinion was not consistent with the medical record, because there was "little evidence" in the record to suggest that, 10 months after surgery, Plaintiff continued to have severe functional restrictions; and (2) it was inconsistent with Plaintiff's activities of daily living, namely his ability to live independently during this time. (AR 21.)  With regards to the first reason—the purported inconsistency of Dr. Steiger's opinion with the record as a whole—the ALJ observed that, according to Dr. Bernabe, less than a month earlier, in January 2016, Plaintiff had exhibited a full range of motion in his

1  elbows, normal muscle strength in his upper and lower extremities, and a normal gait and
2  posture.  (AR 20.)

3

4  At no point in his decision did the ALJ mention the extensive progress notes provided
5  by Plaintiff's treating orthopedic surgeon, Dr. Andrew Wong.  (*See generally* AR 17-22.)  Dr.
6  Wong had opined repeatedly between the date of Plaintiff's left elbow injury in May 2014 and
7  the end of August 2015, more than a year later, that Plaintiff was prohibited from lifting,
8  carrying, pushing, or pulling greater than 10 lbs with his left arm. (AR 538, 544, 551, 555,
9  1307, 1314.)   Additionally, during Plaintiff's two-month postoperative recovery period
10  following his April 3, 2015 elbow surgery, Dr. Wong had opined that Plaintiff was temporarily
11  totally disabled.  (AR 569, 571, 602.)

12

13    **D. Discussion**

14

15  Having reviewed the record in its entirety, the Court finds that the ALJ wholly
16  disregarded the repeated opinions of Plaintiff's treating orthopedic surgeon, Dr. Andrew
17  Wong, failing to even mention Dr. Wong's name in the course of his decision.  The Court also
18  finds that the RFC assessed by the ALJ, and, specifically, his determination that Plaintiff
19  retained the capacity to lift up to 50 pounds occasionally and 25 pounds frequently with both
20  arms (AR 18) is not supported by substantial evidence in the record.

21

22  To the contrary, Plaintiff's medical records show that, for more than a year following
23  his left elbow injury, Plaintiff was barred by his treating orthopedic surgeon from lifting,
24  carrying, pushing, or pulling greater than 10 lbs with his left arm.  (AR 538, 544, 551, 555,
25  1307, 1314.)  Dr. Wong's assessment is supported by his extensive treatment notes with
26  objective findings, including MRIs and physical examinations, as well as the treating notes of
27  Plaintiff's occupational therapist who oversaw Plaintiff's postoperative recovery.  In addition,
28  more than four months after Plaintiff's surgery, in August 2015, Dr. Wong determined that

Plaintiff had not responded completely to the elbow surgery, had developed significant swelling, and, further, had developed a new area of "firm" swelling with an unknown cause. (AR 1314.)  Three years later, in August 2018, after Plaintiff had changed age categories, Dr. Zarins, another orthopedic surgeon, determined that Plaintiff remained unable to return to his prior work as a mechanic and "should avoid repeated forceful grasping on the left as well as very heavy pushing and pulling activity greater than 30 pounds with the left upper extremity at or about chest height."  (AR 1361.)  Accordingly, in order to assess the RFC that the ALJ did, the ALJ had to overlook the preponderance of the evidence in the record and, instead, focus on an isolated quantum of evidence:  the opinion of the consultative examining physician, Dr. Bernabe, who did not review any of Plaintiff's medical records before issuing his opinion; and the opinion of two state agency consultants who never examined Plaintiff in person and lacked expertise in orthopedics and orthopedic surgery.

As stated above, an ALJ "cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them," *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015), and "may not simply disregard" a treating physician's opinion simply because it is contradicted, *Ghanim*, 763 F.3d at 1161.  However, this is precisely what the ALJ did with respect to Dr. Wong's opinions.  Further, when the record is looked at as a whole, it is plain that only a scintilla of evidence supports the ALJ's determination that Plaintiff retains the capacity to perform medium work, *i.e.*, use both arms to lift up to 50 lbs occasionally and 25 lbs frequently.  Accordingly, the ALJ erred in his analysis of the medical evidence and, within that, the opinions of Plaintiff's treating physicians, and the ALJ's ultimate RFC assessment is not supported by substantial evidence in the record.  The matter must be remanded for further consideration of the medical evidence.  On remand, the ALJ shall articulate specific and legitimate reasons supported by substantial evidence in the record for discounting Dr. Andrew Wong's opinions and formulate an RFC that is supported by a preponderance of the evidence in the record.  Further, if the ALJ concludes that Plaintiff's RFC changed over time in response to Plaintiff's numerous injuries, surgeries, and periods of

1    recovery, the ALJ should consider whether, for any continuous period of 12 months or more

2    during the relevant timeframe, Plaintiff was limited to light or sedentary work.

3

4    **II.    The ALJ's Evaluation of Plaintiff's Statements About His Symptoms**

5

6         **A. Plaintiff's Statements**

7

8         The second issue in dispute is whether the ALJ properly evaluated Plaintiff's statements

9    about the severity and limiting effects of the symptoms caused by his medically determinable

10   impairments.

11

12        In an October 6, 2015 Adult Function Report, Plaintiff reported that his left elbow injury

13   prevented him from lifting, pulling, or shoving more than 10 lbs and he experienced

14   incontinence due to his prostatectomy.  (AR 332.)  He stated that, during an average day, he

15   showers, dresses and feeds himself, watches TV, reads, and walks around the backyard.  (AR

16   333.)  He stated that before the onset of his impairments, he did yard work and gardening,

17   went on walks and for hikes, rode motorcycles, worked on cars, and did home improvement

18   projects.  (AR 333, 336.)  He wrote that he can drive but not for long because of pain in his

19   back.  (AR 335.)  He stated that he goes grocery shopping once or twice a week for 15-20

20   minutes a visit.  (AR 335.)  He stated that his sleep is interrupted by the pain in his elbow and

21   shoulder.  (AR 333.)  When asked if he prepares meals or food, he wrote "does not apply."[9]

22   (AR 334.)  When asked if he performs household chores, Plaintiff wrote that he can dust and

23   do small loads (less than 10 lbs) of laundry.  (AR 334.)

24

25

26

27   ───────────────

     [9]      Plaintiff's live-in girlfriend, Rosi DiPonio, reported in a Third Party Adult Function Report prepared on April 17,
28   2016 that Plaintiff does not cook anymore and she prepares food for him.  (AR 352.)  She stated that once or twice a week
     Plaintiff prepares sandwiches or frozen meals, but she usually leaves food for him to warm up.  (AR 353.)

1    Plaintiff also completed an April 17, 2016 Adult Function Report, which is substantially

2    similar to the October 2015 Report.  Plaintiff reiterated his earlier statements from his prior

3    Adult Function Report, including that he is unable to lift, pull, or shove more than 10lbs.  (AR

4    371.)  He also stated that when he shops, his girlfriend comes with him because he cannot lift

5    anything more than a few pounds.  (AR 374.)

6

7    Finally, at the August 22, 2018 hearing, Plaintiff testified that at some point in late 2015

8    he moved to Lake Havasu, Arizona, because he owned a home there but was paying rent to

9    live in California.  (AR 43.)  He testified that, ever since moving to Lake Havasu, he had lived

10   by himself.   (AR 43.)   Plaintiff's counsel clarified that, based on various documents, he

11   believed Plaintiff moved to Lake Havasu at the end of 2016, not 2015.  (AR 58.)  Plaintiff

12   later said that it is possible he had misremembered, stating "I don't remember.  Time is hard

13   to recall anymore."  (AR 59.)

14

15   Plaintiff testified that he had driven himself to the hearing, which was more than an hour

16   drive.  (AR 43.)  He testified that he traveled once a year to visit his sister in the State of

17   Washington.  (AR 59.)  He testified that, although he had moved to Lake Havasu, he had not

18   switched doctors and drove back to California for all of his medical appointments, a trip that,

19   with breaks, sometimes took him six to seven hours to complete.  (AR 59-61.)

20

21   Plaintiff testified that, following his prostatectomy, he felt forced to go back to work

22   before he was ready and, because he found himself unable to put pressure on his torso when

23   pulling a radiator from a vehicle, he used only his arms to pull the radiator and ended up

24   hurting his left elbow.  (AR 46.)  He testified that he spends most of the day walking around

25   the house a little bit, playing with his dog, lying on the couch, and, once in a while, going to

26   the grocery store.  (AR 54.)  He testified that he could lift "maybe ten, 20 pounds, max."  (AR

27   54-55.)  He testified that his cousin lives in town and he sometimes meets up with her to swim

28   in her pool, which, he said, "helps."  (AR 62.)  On other occasions they go to the movies

together or have dinner.  (AR 62.)  Plaintiff testified that, before the onset of his impairments, his primary hobby was doing his job because he "really liked—loved [his] job."  (AR 62.)  He testified that he had also once enjoyed walking, hiking, and surfing—activities he feels he can no longer do.  (AR 62.)

**B.  ALJ's Decision**

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (AR 19-20.) Specifically, the ALJ stated that Plaintiff's clinical examinations showed him continuing to function at a high level.  (AR 20.)  The ALJ then summarized the medical evidence, but, as discussed *infra*, omitted any reference to the progress notes and clinical examinations performed by Plaintiff's treating orthopedic surgeon, Dr. Andrew Wong.  (AR 20-21.)  The ALJ later added that Plaintiff's activities of daily living also showed him "functioning at a high level."  (AR 21.)  The ALJ observed that Plaintiff testified that he is able to live alone and maintain his home independently.  (AR 21.)  The ALJ added that Plaintiff "often swims for exercise" and "continues to go on trips, even driving long distances on a regular basis." (AR 21.)

**C.  Applicable Law**

An ALJ must make two findings before discounting a claimant's statements regarding the severity and persistence of her symptoms.  *See Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).

20

"Second, if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony regarding the severity of the claimant's symptoms" and those reasons must be supported by substantial evidence in the record. *Id.*; *see also Marsh v. Colvin*, 792 F.3d 1170, 1174 n.2 (9th Cir. 2015); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1161 (9th Cir. 2008). The ALJ must specifically identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015) (finding legal error where the ALJ "failed to identify the testimony she found not credible"); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion.").

In March 2016, the Commissioner promulgated Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, which "makes clear what [Ninth Circuit] precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms' . . . and not to delve into wide ranging scrutiny of the claimant's character and apparent truthfulness." *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017). Under SSR 16-3p, the ALJ shall determine whether to credit a claimant's statements about his pain and limitations by referring to the factors set forth in 20 C.F.R. § 404.1529(c)(3), which include: the claimant's daily activities; the factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; the claimant's treatment, other than medication, for the symptoms; any other measure that the individual uses to relieve pain or other symptoms; and, finally, "any other factors concerning an individual's functional limitations and restrictions." SSR 16-3p. However, the lack of objective medical evidence supporting a claimant's allegations cannot provide the sole basis for rejecting his statements about the severity of his symptoms and limitations. *Id.*; *see also Trevizo*, 871 F.3d at 679; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)

1   ("we will not reject your statements about the intensity and persistence of your pain or other
2   symptoms or about the effect your symptoms have on your ability to work solely because the
3   available objective medical evidence does not substantiate your statements").

4

5   **D. Discussion**

6

7       The ALJ's decision falls short of these standards.  The ALJ cited only one reason for
8   discounting Plaintiff's statements about the severity of his symptoms and their limiting effects:
9   their purported inconsistency with his clinical examinations.  (AR 20.)  According to the ALJ,
10  who ignored the entirety of Plaintiff's treatment records from his treating orthopedic surgeon,
11  Dr. Andrew Wong, these clinical examinations showed Plaintiff "continuing to function at a
12  high level." (AR 20.)  The ALJ did not specify what he meant by "a high level" nor did he
13  explain how the clinical examinations were inconsistent with any portion of Plaintiff's
14  subjective symptom allegations.  Accordingly, the ALJ erred by (1) failing to identify what
15  specific testimony he declined to credit, *Brown-Hunter*, 806 F.3d at 494, (2) failing to identify
16  what specific aspect of the medical evidence undermined that testimony, *id.*, and (3) using a
17  purported inconsistency with the objective medical evidence as the sole basis for rejecting
18  Plaintiff's statements about the severity of his symptoms and limitations, 20 C.F.R. §
19  404.1529(c)(2); SSR 16-3p; *Trevizo*, 871 F.3d at 679.

20

21      Nevertheless, out of an abundance of caution, the Court has considered the possibility
22  that the ALJ's discussion of Plaintiff's activities of daily living in the context of the medical
23  evidence generally was intended as a second basis for discounting some portion of Plaintiff's
24  statements.   Again, however, the ALJ did not identify what specific testimony he was
25  discounting and what specific activities of daily living undermined that testimony.  *See Brown-*
26  *Hunter*, 806 F.3d at 494; *Parra*, 481 F.3d at 750; *Smolen*, 80 F.3d at 1284.

27

28

Furthermore, an ALJ may rely on a plaintiff's activities to discount the plaintiff's statements about his symptoms and limitations only when those activities either:   (1) "contradict" the plaintiff's testimony; or (2) "meet the threshold for transferable work skills"—that is, where the plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." *Orn*, 495 F.3d at 639.  The ALJ has not asserted that Plaintiff spends a substantial part of each day performing activities that are transferable to a work setting.  Instead, it appears that the ALJ concluded that Plaintiff's activities contradict his testimony.  The Court agrees that there are some portions of Plaintiff's testimony that are inconsistent with his prior allegations—most notably, Plaintiff had alleged in his 2015 and 2016 Adult Function Reports that he could not drive for long periods, but, in August 2018, he reported driving to the State of Washington from Lake Havasu, Arizona once a year and intermittently driving long distances for medical appointments in California.  However, the ALJ also mischaracterized Plaintiff's activities of daily living, stating that Plaintiff "often swims for exercise."  (AR 21.)  This is not an accurate description of Plaintiff's testimony.  In fact, Plaintiff testified that, although he does not go out very often, he sometimes visits his cousin who also lives in Lake Havasu and they go to the movies together, have dinner, or go swimming in her pool, "which helps."  (AR 61-62.)  The ALJ did not ask Plaintiff to explain what he meant when he said that swimming "helps," but the obvious implication is that Plaintiff, who has in his 60s with an extensive history of injuries, surgeries, and carpal tunnel, finds being in water to be therapeutic.  Furthermore, the Court sees no reason why occasional swimming would be inconsistent with Plaintiff's allegations that he cannot, or, at least, for a period of more than a year, could not, lift, pull, or shove more than 10 lbs with his left arm.

Similarly, the ALJ stated that Plaintiff "continues to go on trips, even driving long distances on a regular basis."  (AR 21.)  In fact, Plaintiff testified that once a year he goes on a trip to visit his sister in the State of Washington and he intermittently travels to California for doctor's appointments because he does not want to change medical providers and is

concerned that he would not receive the same quality of care at the hospital in Lake Havasu. (AR 59-61.)  Specifically, Plaintiff testified that, in the preceding eight months, he had driven back to California for medical appointments twice.  (AR 61.)  Plaintiff did not testify that he was travelling recreationally or going on long drives for any reason other than to see family and receive medical treatment from the providers he trusts.  (*See generally* AR 59-61.) Accordingly, the ALJ's statement that Plaintiff continues to go on "trips" on a "regular basis" is misleading.  Moreover, the Court sees no reason why Plaintiff's occasional long car trips would be inconsistent with Plaintiff's allegations that he cannot, or, at least, for a period of more than a year, could not, lift, pull, or shove more than 10 lbs with his left arm.

In sum, to the extent that the ALJ may have cited Plaintiff's activities of daily living to support his decision to discount Plaintiff's subjective symptom allegations in their entirety, those activities do not constitute convincing reasons supported by substantial evidence in the record for discounting Plaintiff's subjective symptom complaints.  As stated above, the only other reason the ALJ gave was the purported inconsistency between the Plaintiff's complaints and the objective evidence, which cannot provide the sole basis for rejecting his statements about the severity of his symptoms and limitations.  Thus, the ALJ erred in his evaluation of Plaintiff's subjective symptom statements, and the matter must be remanded for reevaluation of Plaintiff's symptom allegations.  On remand, the ALJ must articulate clear and convincing reasons supported by substantial evidence for discounting any portion of Plaintiff's subjective symptom complaints, and the ALJ must specifically identify what portion of those complaints he is discounting and what specific evidence undermines those complaints.  Further, if the ALJ concludes that the type, severity, and limiting effects of Plaintiff's symptoms changed over time, he should consider whether, for any period of a year or more during the relevant timeframe, some portion of Plaintiff's subjective symptom complaints should be credited.

\\

\\

\\

**III.      Remand For Further Proceedings is Warranted**

Based on the foregoing, the ALJ erred in his assessment of both the medical evidence—particularly the evidence provided by Plaintiff's treating physicians—and Plaintiff's statements about the severity and limiting effects of his symptoms.  Having determined that the matter must be remanded for further consideration of the record in its entirety to properly assess Plaintiff's residual functional capacity, the Court exercises its discretion not to reach the merits of the third issue in dispute concerning the ALJ's reliance on the VE's testimony about the nature of Plaintiff's past relevant work and Plaintiff's acquisition of transferable skills.

The decision whether to remand for further proceedings or order an immediate award of benefits is within the district court's discretion.  *Harman v. Apfel*, 211 F.3d 1172, 1175-78 (9th Cir. 2000).  A district court may remand for an award of benefits when the following three conditions are satisfied:  "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  *Garrison*, 759 F.3d at 1020.  The third of these conditions "incorporates . . . a distinct requirement of the credit-as-true rule, namely that there are no outstanding issues that must be resolved before a determination of disability can be made."  *Id.* at 1020, n.26.  However, even if those three requirements are met, the Court retains "flexibility" in determining the appropriate remedy and may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."  *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014) (quoting *Garrison*, 759 F.3d at 1021).

In this case, the Court cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand. *See Garrison*, 759 F.3d at 1020. This case, then, is not the "rare exception" in which the credit as true rule should be applied and the matter remanded for the calculation and award of benefits. *See Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017). Therefore, the Court remands for further consideration.

In particular, one issue that warrants closer inspection on remand is whether the evidence shows that, due to the combination of Plaintiff's age, work experience, and severe and medically determinable impairments, there was ever a continuous period of at least 12 months or more during the relevant timeframe when Plaintiff was unable to engage in substantial gainful activity, "gridded out," and/or was functionally limited to light or sedentary work. Due to the overlapping periods of injury, surgery, post-operative recovery, and medical improvement concerning different medically determinable impairments, the ALJ may benefit from the testimony of a medical expert in making this assessment.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED to the Commissioner for further proceedings consistent with this memorandum of decision.

\\

\\

\\

\\

\\

\\

\\

26

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATE: August 5, 2020

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE

27